Whitaker, Judge,
on October 2, 1951, delivered the opinion of the court:
Plaintiff, W. C. Shepherd, entered into a contract with the defendant to construct the Cumberland Oil Field protective levees, which was a part of the Denison Dam and Reservoir Project on the Red River between Oklahoma and Texas. The Denison Dam is about ten miles below the confluence of the Washita and Red Rivers. After it had been completed it was expected that the water in the Washita River would be backed up for about forty miles. The Cumberland Oil Field lies adjacent to the Washita River at a point about thirty miles above the Denison Dam, and the backwater would have flooded it. At the time this field had seventy-five producing oil wells and it was expected that an additional seventy-five wells would be drilled in the near future. The construction of the levees was to protect these oil fields.
A part of the work consisted in the diversion of the Washita River at the upper part of the work. A channel about 3,300 feet long and 600 feet wide and around forty feet in depth was to be constructed, through which the river was to be diverted. This was known as Channel No. 1. On leaving this channel the water was designed to flow down a natural declivity and then into another channel, known as Channel No. 2, which was to be about 7,000 feet long and 350 feet wide, involving cuts up to as much as 80 feet in depth.
The protective levees were to be constructed for the most part from the material excavated from the two channels. The levees were to have a total length of 23,480 feet, and an average height of about 50 feet.
*810 Plaintiff claims that in tbe excavation of Channel No. 2 he encountered, wet materials, which differed materially from the character of materials shown on the drawings or indicated in the specifications, and that he is, therefore, entitled to a modification of the contract to provide for the increase in cost in the handling of this wet material over what it would have cost to handle the material plaintiff says he had a right to expect. He also says that in the excavation for Channel No. 1 he encountered and had to handle much more pervious material than he had reason to expect.
His third claim is that the contracting officer required excessive wetting of the levees and unnecessary compaction of the materials placed therein. He claims damages for the increased cost of doing this work in the manner required.
One of defendant’s defenses is that plaintiff had failed to follow the requirements of the contract to entitle him to claim increased compensation because unforeseen conditions had been encountered, and also that he had acquiesced in the requirements for excessive watering and compaction in the building of the levees.
As an alternative claim, plaintiff says that the design of the levees was changed in order to utilize the unexpected amount of pervious material encountered in Channel No. 1, and that he is entitled to an equitable adjustment under article 3 of the contract.
Prior to the taking of testimony in the case the defendant moved for an order to limit the issues to be tried by the Commissioner to the question of whether or not the plaintiff was “precluded from recovery by virtue of the contract provisions relating to protests and appeals.” Plaintiff interposed no objection to this motion and it was allowed. On the hearing, however, a great deal of testimony was introduced by both parties which had no relation to whether or not the plaintiff had followed the requirements of the contract relative to protests, notice and appeal, but there seems to be some uncertainty about whether or not the defendant intended to close its proof on the entire question of liability. It is clear that the parties did not intend to close their proof on the question of the amount plaintiff is entitled to recover, if any.
*811 Because of this uncertainty and, particularly, in the light of defendant’s motion to limit the issues to the question of whether or not the contract provisions relating to protests and appeals had been complied with, the acquiescence in this motion by the plaintiff, and the allowance of it by the court, this opinion is limited to this question.
The main issue concerns the wet material encountered in Channel No. 2. Plaintiff says this was an unexpected condition which entitles him to recover under Article 4 of the contract. Article 4 first provides that if the contractor encounters or the Government discovers subsurface and/or latent conditions which materially differ from those shown on the drawings or indicated in the specifications “the attention of the contracting officer shall be called immediately to such conditions before they are disturbed.”
The contract does not say explicitly whose duty it is to call such a situation to the attention of the contracting officer, but it is evident that if these conditions are encountered by the plaintiff, it is the plaintiff’s duty to do so, if he expects to make a claim on account thereof.
We think the plaintiff discharged this responsibility.
Before recounting the facts, we think we should state the powers and duties of the defendant’s representatives in charge of this project. Colonel W. W. Wanamaker was the contracting officer. He was the District Engineer at Denison, Texas. During the time of the performance of this contract he was the contracting officer for several hundred contracts, including twenty-five major projects. H. L. Johnson was assistant to the District Engineer with the title of Chief of Operations. Marshall N. Oliver was the Resident Engineer, and was in immediate charge of the project. Because of the contracting officer’s wide responsibilities, Johnson was, in addition to other responsibilities given him, delegated full authority to secure performance of this contract in accordance with its provisions. He was the superior of the Resident Engineer and was authorized to decide disputes between the contractor and the Resident Engineer, but he did not have authority to issue change orders or increase the contract price. This could be done only by the contracting officer, in accordance with the contract.
*812 The wet material was first encountered in June 1943. At first defendant’s inspectors permitted plaintiff to waste it, but the Resident Engineer overruled them and required the material to be placed in the levees. Within a short time thereafter plaintiff’s superintendent called the attention of the Chief of Operations to the presence of this wet material and stated to him that its excavation and its placement on the fill was largely increasing the contractor’s costs. The Chief of Operations examined the situation, not only on this occasion but on several other occasions, and concurred in Oliver’s decision that it was suitable material and in his direction that it be placed in the fill.
Also, in June 1943, shortly after this wet material had been encountered, the contracting officer himself came to the job and plaintiff’s superintendent pointed out to him this wet material. Colonel Wanamaker, the contracting officer, did not make any comment at the time, but he subsequently discussed the situation with Johnson, the Chief of Operations, and he was advised that Johnson and Oliver, the Resident Engineer, had determined that the material was suitable for use on the fill, and he took no action to the contrary.
Following this, the plaintiff and his engineer conferred with the Resident Engineer. Plaintiff complained about the additional costs being incurred by the requirement that the wet material be used and stated that he expected to be paid his excess costs. He inquired whether he should shut down the job and submit a written statement concerning the situation, or whether he should file his claim at the end of the job. The Resident Engineer told plaintiff that he would not permit him to shut down the job, but that he would have to continue the work as directed. He also stated that the proper time for plaintiff to present his claim was at the conclusion of the job.
Plaintiff also conferred with the Resident Engineer on the job in August and September and renewed his complaints about the use of this material and his demand for additional compensation.
In August 1943 plaintiff’s superintendent, Herbert Shepherd, went to the District Office at Denison, Texas, and talked with Colonel Wanamaker, the contracting officer, about the situation, not only the situation encountered in Channel No. *813 2, but tbe unexpected quantity of pervious material encountered in Channel 1, and the difficulties the contractor was having with the rolled fill. The contracting officer told plaintiff’s superintendent that he approved of the determination of Oliver and Johnson that the wet materials should be used in the fill; however, he testified that it was his intention to review all the evidence relating to this wet material to determine whether or not it was a condition calling for an adjustment under article 4 of the contract. He did not communicate this intention to plaintiff’s superintendent, but the superintendent- testified that he left the conference with the impression that further consideration would be given to plaintiff’s claims.
Colonel Wanamaker never carried out his intention because shortly after the conference he was transferred from his post at Denison on about 48 hours’ notice. He had no opportunity to confer with his successor, and did not advise him of his conversation with plaintiff’s superintendent.
Finally, in October 1943 plaintiff began bypassing the wet materials and was excavating dry material only. He was, however, directed by the Resident Engineer and by the Chief of Operations to resume excavating the wet material, and he agreed to do so.
There can be no doubt that plaintiff repeatedly called to the attention of the Resident Engineer and the representative of the contracting officer, and on one or two occasions to the attention of the contracting officer himself, the conditions encountered, and that he was incurring increased costs on account thereof. It does not appear that he ever expressly stated to any of defendant’s representatives that he thought this was a changed condition within the purview of article 4 of the contract, but there was little point in his calling to the attention of the contracting officer and his representatives such conditions and the increased costs he was incurring, except to secure additional compensation, and his only right to additional compensation was under article 4. The contracting officer must have known he was making a claim under that article. If there was any doubt in his mind about this, this doubt ought to have been dispelled by plaintiff’s conference with the Resident Engineer on July 1,1943. *814 Plaintiff then said to him that he expected to be paid for the additional expense incurred, and he wanted to know whether or not he should shut down the job and submit his claim at that time. The only claim he could have filed would have been a claim under article 4. So that, while plaintiff did not expressly say he was making claim under article 4, he did so by implication, at least.
It is true that plaintiff’s statement was made to the Resident Engineer and not to the contracting officer or the Chief of Operations. The Resident Engineer, however, knew that plaintiff had complained to both Colonel Wanamaker and Mr. Johnson about the wet material and the extra costs it was entailing; and if he had any doubt that plaintiff meant to make a claim under article 4 on account thereof, or thought his superiors might have such a doubt, it was certainly his duty to inform his superiors of the contractor’s statement on July 1,1943, that he did mean to make a claim.
Article 4 of the contract requires of the plaintiff only that he call to the attention of the contracting officer the conditions encountered; it does not require him to notify the contracting officer that he claims that these conditions entitle him to relief under article 4. But if it may be implied that the contracting officer should be put on notice that plaintiff intended to file a claim for the additional costs incurred, we think plaintiff did this by notifying the contracting officer and his authorized representative of the condition and that he was incurring additional expense on account thereof, and by later asking the contracting officer’s subordinate, the Resident Engineer, if he should shut down the job and make claim then or wait until the job had been concluded. Under all the circumstances we think plaintiff sufficiently complied with the duty cast upon him to call the alleged unforeseen conditions to the attention of the contracting officer.
After plaintiff has discharged this responsibility of calling the situation to the attention of the contracting officer, the duty is then cast on the contracting officer to promptly investigate the conditions, and article 4 requires that “if he finds that they do so materially differ,” the contract should be modified to provide for any increase or decrease in cost. The contracting officer, however, is authorized to modify the *815 contract only with the written approval of the Secretary of War or his duly authorized representative. This latter provision requiring the approval of the Secretary of War is of course for the purpose of protecting the Government against incurring additional expense without approval of authority higher than the contracting officer, and the requirement that the contracting officer shall promptly investigate the conditions and modify the contract, if he thinks it justified, is for the purpose of preventing the Government from being subjected to unexpected liability after the work had been completed.
However, the only responsibility cast upon the plaintiff by article 4 is to call to the attention of the contracting officer the conditions encountered. What is to be done thereafter is the responsibility of the representative of the Government. Neither the Resident Engineer nor the Chief of Operations ever ruled upon the question of whether or not unforeseen conditions had been encountered. Until an adverse ruling had been made on this question, plaintiff was under no obligation to take any further steps.
It is true that plaintiff’s subcontractor telephoned the Chief of Operations to request assistance in obtaining some equipment and that during the conversation he asked Johnson if he thought the subcontractor should have additional compensation for handling the wet material, and Johnson answered in the negative. This, however, cannot be considered to be a ruling by the contracting officer’s authorized representative that unforeseen conditions had not been encountered. There is no showing that this statement was ever communicated to plaintiff, nor was it any formal ruling, but merely a statement made in the course of a telephone conversation.
When plaintiff’s superintendent visited the contracting officer himself, no ruling was made on this question, but the contracting officer testified that he intended to investigate the situation later in order to determine whether or not article 4 conditions had been encountered. As stated above, he never did so.
No ruling on this question was ever made. When plaintiff filed his formal claim on May 15,1944, the contracting officer merely ruled that plaintiff’s claim had not been filed in time *816 and that plaintiff had failed to comply with the requirement of article 4 that the conditions should be called to the attention of the contracting officer before they were disturbed. The decision of the contracting officer was affirmed by the War Department Board of Appeals on the same ground.
After the plaintiff has called to the attention of the contracting officer the unforeseen conditions encountered, he has no further duty to perform, to entitle him to recover, until after the contracting officer has ruled on whether or not these are such conditions as come within the terms of article 4, and modifies or refuses to modify the contract. When the contracting officer makes such a ruling, then plaintiff, if he is dissatisfied with it, must appeal to the head of the department. But no such ruling has ever been made in this case. So far as plaintiff’s rights under article 4 are concerned, we think he is not precluded by failure to comply with the contract requirements.
What has been said relative to the wet materials encountered in Channel No. 2 is equally applicable to the excess sand encountered in Channel No. 1. We are of opinion that plaintiff’s rights under article 4 are not precluded for failure to comply with the contract requirements relative to the excess sand in Channel No. 1, as well as the wet materials encountered in Channel No. 2.
Whether or not unforeseen conditions were actually encountered is left for later determination.
Plaintiff’s only right to recover under article 3 is in respect to the change in the design of the levees so as to use in them the unexpected amount of sand, or pervious material, encountered. The contracting officer was authorized to make this change by article 3 of the contract. Indeed, the specifications suggested the possibility that more sand might be encountered, and they required that all suitable materials should be placed in the levees.
Paragraph 4-05, (b) (1) of the specifications stated:
* * * There are areas of fairly clean sand that will require excavation without mixing in order to construct the pervious zones of the fill section of the levees in fill Area II. This required pervious zone is comparatively small in section and may be enlarged if pervious material is encountered in larger quantities. * * *
*817 Paragraph. 4-01 of section IV of the specifications provided :
* * * It is the intent of these specifications to require the contractors to utilize all suitable materials excavated from the channels in the construction of the rolled-fill levees and contractors will not be permitted to substitute borrow materials therefor so long as suitable materials are available from the channels. * * *
The possibility of the necessity for a change in the design of the levees was, therefore, in the minds of the parties, and article 3 authorized the contracting officer to make such changes.
If the changes made increased plaintiff’s costs, article 3 obligated plaintiff to assert his claim for an adjustment “within 10 days from the date the change is ordered.” This plaintiff did not do. There is no right of recovery under article 3 of the contract.
Failure to follow the required administrative procedure is not involved in plaintiff’s claim that the contract was breached in the requirements for watering and compacting the fill. The specifications in this case contain no provisions for protest against the requirements of defendant’s representatives on the job that work was being required of them over and beyond the provisions of the contract.
The case is remanded to the Commissioner to take any further evidence the parties may desire to offer on the question of defendant’s liability on account of the encountering of the wet materials in Channel No. 2, and the excessive amount of sand in Channel No. 1 — exclusive of the question of compliance with the contract requirements relative to notice, protests and appeals — and on the question of defendant’s alleged breach of the contract relative to watering and compacting the fill. The Commissioner will also receive evidence on the amount of defendant’s liability, if any, as limited by this opinion, and he will make his report on both the question of liability and the amount thereof, if any.
Further proceedings are suspended until the incoming of this report.
Howell, Judge; MaddeN, Judge; LittletoN, Judge; and JONES, Chief Judge, concur.